HARRIS v. GALE.

(Circuit Court, E. D. Oklahoma. June 29, 1911.)

No. 1,459.

INDIANS (§ 15*)—ALIENATION OF LAND—STATUTES—EFFECT.

Act Cong. May 27, 1908, c. 199, § 9, 35 Stat. 315, providing that the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of his land, provided that no conveyance of the interest of any full-blood Indian heir therein shall be valid unless approved by the court having jurisdiction of the settlement of the estate of the deceased allottee, applies to conveyances of interest of heirs of deceased allottees whether such death occurred before or after May 27, 1908.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

In Equity. Bill by John Harris, guardian, against G. W. Gale. Demurrer sustained, and bill dismissed.

J. F. Bledsoe, J. C. Little, and E. D. Slough, for complainant.
H. A. Ledbetter and S. T. Bledsoe, for defendant.

CAMPBELL, District Judge. The question for consideration arises upon defendant's demurrer to complainant's bill. By the bill it is sought to have canceled, as a cloud upon the title to certain lands of the complainant's minor ward, a deed made by complainant as guardian of such ward, because it was not approved by the Secretary of the Interior. The ward is a full-blood Choctaw Indian. The land was the allotment of her ancestor, also a full-blood Choctaw Indian, who died in March, 1905, whereupon the ward inherited the land. Subsequent to the passage of the act of Congress approved May 27, 1908 (chapter 199, 35 Stat. 312), on petition of the guardian the county court of Pittsburgh county ordered the interest of the ward in said land sold; whereupon the sale was duly made, pursuant to said order, for a fair consideration, and duly confirmed by the said court, and deed executed accordingly. The only question to be considered is whether or not, in a case where a full-blood allottee of any of the Five Civilized Tribes has died prior to May 27, 1908, his full-blood Indian heirs, may, after said date, sell their interest in the allotted lands inherited from the deceased without the approval of the Secretary of the Interior.

By section 9 of the act of Congress approved May 27, 1908, supra, it is provided:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of such deceased allottee."

It is contended by complainant that the above provision applies solely to the sale of such inherited land by full-blood Indian heirs, where the death of the ancestor occurs subsequent to the date of the passage of said act, and that, in all cases where the ancestor had died

prior to its passage, a sale by a full-blood Indian heir, even though made subsequent to its passage, must be approved by the Secretary of the Interior as provided in section 22 of the act of April 26, 1906, (chapter 1876, 34 Stat. 145), reading as follows:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and, if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

It appears that for about a year following the passage of the said act of May 27, 1908, the Department of the Interior, charged with the administration of governmental affairs relating to the Indians and the execution of the various acts of Congress pertaining thereto, construed said act as contended for by the defendant, and held that all sales by full-blood Indian heirs of lands inherited from deceased allottees should be approved by the court having jurisdiction of the settlement of the estates of the said deceased allottees, regardless of whether they died before or after May 27, 1908, and that the approval of such conveyances by the Secretary of the Interior was not necessary. But on August 17, 1909, the Attorney General, having been asked his advice thereon, rendered an opinion in which he held:

"That the provisions of section 9 of the act of 1908 could not be held to operate retroactively and to remove absolutely all restrictions upon the alienation of the lands of an allottee who died prior to the passage of the act, and that conveyances made since May 27, 1908, by full-blood Indian heirs of land inherited prior to that date, are not valid unless approved by the Secretary of the Interior, even though they shall be approved by a probate court of the state of Oklahoma."

He further held that the date of the death of the allottee governs the question whether or not the act of 1908 applies. Since the rendition of this opinion, the Department of the Interior has been proceeding in conformity therewith. It is conceded by the Attorney General in his opinion that:

"There would seem to be no good reason in making a difference in the alienability of lands inherited by full bloods prior to the passage of the act and that of land so inherited after its passage."

But he finds:

"The intention of Congress to make such difference is so clear that it may not be disregarded."

To my mind it is not clear that such was the intention. The act provides that the *death* of any allottee *shall operate* to remove all restrictions, etc. That is, the fact of the death of an allottee shall from and after the passage of the act have such effect. But while the operation or effect which the act attaches to the fact of the allottee's

death arises with the act and must, therefore, be of future application and prospective rather than retroactive and retrospective, still it by no means follows that the death of the allottee contemplated by the act is of necessity a death occurring subsequent to its passage. It is the *death* of any allottee which the act provides shall thereafter *operate* to remove restrictions. Is it not the operation or effect of the death rather than the death itself which shall exist or arise after the passage of the act? What more authority is there for reading the act as if it said "the death *hereafter* of any allottee," than for reading it as if it said "the death *heretofore* or *hereafter* of any allottee?" In any event, it would still proceed in the language of the statute "shall operate," etc.

Nor does the use of the word "shall" necessarily confine this act to cases where the ancestor's death occurs after its passage, as is seen from a consideration of a number of cases which the diligence of counsel interested in this case has brought to the court's attention. In the case of Fitzpatrick v. Simonson Bros. Mfg. Co., 86 Minn. 140, 90 N. W. 378, the following statute was involved:

"When any person shall die intestate, seised of an estate of inheritance in any lands, * * * where administration shall not have been granted for five years from the death of the decedent, * * * any heir or grantee of an heir may institute proceedings to obtain a decree of heirship of distribution."

It was held that this statute was applicable to cases where death occurred before the date of its passage. After giving what it considered the reasons for this legislation, the court says:

"We can imagine no other sensible ground upon which the Legislature could have made the distinction in the relief it intended to give or that could have justified the lawmakers in saying this is a wholesome remedy only where its benefits are to accrue to those whose ancestors die five years after the law takes effect, but it is to be withheld from very many otherwise within the benefits we bestow. The reasons are against, rather than in favor of, such an unjust discrimination. * * * Be this as it may, the word 'shall' is often used in remedial statutes in a general sense, including both the past and the future, and should be so considered where a more restricted interpretation *is not required.* We therefore hold that chapter 157, supra, being intended to give a remedy for existing rights, must be liberally construed, in order to accomplish the beneficial purpose for which it was enacted, and should be applied to rights and obligations that accrued before its enactment, as well as those to accrue thereafter.' "

In Maysville & L. R. Co. v. Herrick, 13 Bush (Ky.) 122, a Kentucky statute was involved which provided that any "married woman who shall come to the commonwealth without her husband, he residing elsewhere, may acquire property, contract and bring and defend actions as an unmarried woman." It was held that this statute applied to married women who came to the state before the statute took effect, as well as to one who came afterwards. The court said:

"Mrs. Herrick is within the description of persons intended to be benefited by this statute, unless she is excluded because she came to Kentucky prior to the adoption of the general statutes. To exclude her only because the statute speaks only of married women 'who shall come,' etc., would be to adhere to the letter of the law, and disregard its spirit. It was intended for

an enabling act for the benefit of a class of persons laboring under legal disabilities and not enjoying the protection incident to the state of marriage, because of the absence, from the commonwealth, of their husbands; persons clearly within this class will not be denied the benefit of a remedial statute by grammatical construction, at the expense of the manifest legislative intent."

In Plum v. City of Fond du Lac, 51 Wis. 393, 8 N. W. 283, there was involved a statute of Wisconsin which provided that:

"If any damage shall happen * * * no action shall be maintained thereon, unless, within 90 days after the happening of the event causing such damage, notice in writing * * * shall be given to the mayor," etc.

The court said:

"The learned counsel of the respondent insists that the language in some parts of the section makes this particular provision apply only to cases of future injury. The section begins, 'if any damages shall happen,' and, further on, 'if such damage *shall* happen,' and, in the clause requiring such notice to be given, 'such damage.' This form of the future tense of the verb is very common in statutes which clearly relate to the past as well as the future, and has no particular significance in determining their effect as future or retroactive. By the statute rule of construction the words 'shall have been' include past and future cases (section 4972, Rev. St.), and in Klaus v. City of Green Bay, 34 Wis. 628, it was argued by counsel that the words 'who shall have done work' plainly referred to the future and not to the past, and the present Chief Justice said, in his opinion: 'But there is nothing in the language when considered with reference to the object of the law, which requires that they should have this restricted operation. This and similar language is frequently used in statutes which have been held to operate retrospectively, and we have no doubt the Legislature intended that the remedy should apply to a case like this before us.' This language is entirely appropriate in this case."

In Kelly v. Owen, 7 Wall. 496, 19 L. Ed. 283, the Supreme Court was considering a statute which provided:

"That any woman who might lawfully be naturalized under existing laws. married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen."

The court said:

"As we construe this act, it confers the privileges of citizenship upon women married to citizens of the United States, if they are of the class of persons for whose naturalization the previous acts of Congress provide. The terms 'married,' or 'who shall be married,' do not refer, in our judgment, to the time when the ceremony of marriage is celebrated, but to a state of marriage. They mean that, whenever a woman, who under previous acts might be naturalized, is in a state of marriage to a citizen, whether his citizenship existed at the passage of the act or subsequently, or before or after the marriage she becomes, by that fact, a citizen also. His citizenship, whenever it exists, confers, under the act, citizenship upon her. The construction which would restrict the act to women whose husbands, at the time of marriage, are citizens, would exclude far the greater number, for whose benefit, as we think, the act was intended. Its object, in our opinion, was to allow her citizenship to follow that of her husband, without the necessity of any application for naturalization on her part; and, if this was the object, there is no reason for the restriction suggested."

This question was before the Supreme Court of this state in Ma-Harry v. Eatman, 116 Pac. 935, recently decided and not yet officially

reported, and that court decided that the approval of the Secretary of the Interior was not necessary, saying:

"The only object to be accomplished by requiring the approval of deeds of full-blood heirs by the secretary or the county court was the protection of the living and not the dead. The law in force at the time of the execution of the deed ought to govern, and not that in force at the time of the death of the allottee. This is the construction, as we are advised, placed upon this act by the Department of the Interior for the first year following its passage. What caused a change in the policy or construction of the act by the department, we are not advised; but we know that there was no change in the statute, nor was there any subsequent enactment by Congress authorizing it. We are constrained to hold that after the passage of the act of May 27, 1908, the approval of the Secretary of the Interior was not necessary to the deed of any full-blood heir other than the specific instances in the statutes enumerated, and as the heirs of Davis Lowman, deceased, executing the deed to the plaintiff in error were not in the excepted class, the approval of the county court of McCurtain county of plaintiff's deed in the instant case was sufficient, and said deed so approved conveyed all the title of the heirs of the deceased allottee in said land."

There being no conceivable reason why Congress should have intended to distinguish between conveyances by full-blood heirs of inherited lands, made subsequent to the act of May 27, 1908, where the ancestor died prior to that date, and where the ancestor died subsequent to that date, and the language of the act itself not so clearly evincing such an intention as to preclude the contrary construction, it is decided that by the said act any full-blood Indian heir of any deceased allottee of the Five Civilized Tribes is authorized to convey any interest in the lands inherited by him, from such deceased allottee, upon approval thereof by the court having jurisdiction of the settlement of the estate of such deceased allottee, whether such death occurred before or after May 27, 1908, and the approval of such conveyance by the Secretary of the Interior is not required. Of course, in cases where such heir is a minor, the procedure to secure the necessary order and approval of the court must be as in cases of other minors.

The demurrer must therefore be sustained, and the bill dismissed. It is so ordered.